PLAINTIFFS' EXHIBIT A

UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF MONTANA

GINGER KATHRENS, and        )
THE CLOUD FOUNDATION,        )
                            )
          Plaintiffs,        )
                            )
v.                           )          Civ. No. 18000125 (SPW/TJC)
                            )
RYAN ZINKE, Secretary        )
Department of the Interior, et al.,  )
          Defendants.        )

## DECLARATION OF GINGER KATHRENS

1.      I am an Emmy award-winning producer, cinematographer, writer, editor, and public speaker. I have dedicated the past 24 years to the observation and documentation of wild horses in ten western states. I am also the founder and Executive Director of the Cloud Foundation, a nonprofit 501(c)(3) organization dedicated to the preservation and welfare of America's wild horses, particularly the Pryor Mountain Herd. I am submitting this declaration in support of Plaintiffs' motion for injunctive relief, both in my capacity as an individual Plaintiff and on behalf of The Cloud Foundation.

2.      I first visited the Pryor Herd in 1994. The Pryor Herd has been identified by experts as one of the most "Spanish looking" of wild horses in North America. They are distinctive for their unique colors, and world-renowned for their spirit and beauty.  When I arrived on the range, I was instantly captivated by the topography and the beauty of the landscape. Yet, nothing could compare to the first time I saw one of the Pryor horses. As I was walking the Administrative Pastures, I came upon a beautiful black stallion that took my breath

away. I later discovered that the black stallion I first encountered was Raven, who was soon to become the father of Cloud—the namesake of our organization.

3.      As I continued to observe the herd, I became increasingly fascinated with the unique coloring of the horses and the herd's social structure. These horses have a rich society that is almost wolf-like, with a dominant stallion and a lead mare who frequently leads the family band to water and shelter. I was fascinated by the complexity of it all, and I began to take notes identifying the band stallions, their band mares, and other members of each group. I continue to take these notes to this day, and now have a complete database of the family history of the Pryor Herd. Of the horses alive today, I knew their parents, and their grandparents. I have followed them as they grew, and I have developed deep and personal relationships with each of these horses.

4.      I have visited the Pryor Herd regularly since 1994 to document behavior, catalog individual horses and bloodlines, and enjoy viewing these majestic animals in their natural environment. I have concrete plans to continue doing so in the future.

5.      In addition to my personal interests, I have a professional interest in the Pryor Herd as a professional filmmaker. I have studied and documented this herd since 1994, and my work has produced three award-winning films that chronicle the life of Cloud, a wild Pryor Mountain stallion. The films, *Cloud: Wild Stallion of the Rockies*; *Cloud's Legacy: The Wild Stallion Returns*; and *Cloud: Challenge of the Stallions,* aired on PBS's Nature series. I have also written, edited, and produced over two dozen segments of the Wild America series for PBS and have filmed wild horses for National Geographic, the Discovery Channel, Animal Planet, and the BBC. I have also authored three natural history books about Cloud, and dozens of articles about wild horses and burros. My documentation and analyses of wild horse behavior have been

compared by some to Jane Goodall's work with chimpanzees. These works have been pivotal in stimulating public interest and have contributed to a national dialogue about the federal government's treatment of wild horses.

6.      I speak throughout the United States about the plight of wild horses on public lands. I am also a frequent speaker on the subject of wild horse management and have spoken at a National Academy of Sciences meeting in California, the 2012 International Equine Conference in New York, the 2013 American Equine Summit in New York, Equine Affaires in Massachusetts, Ohio, and California, the Rocky Mountain Horse Expo in Colorado, the Horse Expo in California, the Midwest Horse Fair in Wisconsin, and Breyerfest in Kentucky, in addition to speaking at the Carnegie Museum of Natural History and the Denver Museum of Natural History, colleges, universities, high school and elementary schools throughout the United States. I use these speaking opportunities to reach out to families and particularly children, and to spark compassion for wild horses and all animals, in the hopes that the public will advocate for more humane treatment and management by the Bureau of Land Management ("BLM"). I have also testified before Congress on wild horse issues, which I regard as an opportunity to persuade policy makers to mandate more protective and humane management of wild horses.

7.      I founded the Cloud Foundation out of my knowledge and fear for not only Cloud's herd, but other wild horses in the West. I currently serve as the Executive Director. The Foundation is dedicated to preventing the extinction of Cloud's herd, the genetically unique Pryor Mountain Mustangs that descended from the original Colonial Spanish horses brought to the Americas by Spanish conquistadors. The Foundation is also determined to protect other wild horse herds on public lands, especially isolated herds with unique characteristics and historical significance. To these ends, The Cloud Foundation advocates for the humane treatment,

3

preservation, and management of wild horses on and off the range. We regularly comment on BLM's proposed management actions, especially those actions concerning this herd, and endeavor to provide information—particularly information concerning the Pryor Herd, which we have been documenting for over two decades—to BLM to help inform their management actions. The Cloud Foundation also works to inform the public about Cloud's herd and legacy. We regularly publish stories and updates about the Pryor Herd to our followers around the world on various social media. The Cloud Foundation's Facebook page alone has over 400,000 followers.

8.     In October 2015, Congressman Raul Grijalva, who was the ranking member of the Natural Resources Committee of the House of Representatives, nominated me to serve on the National Wild Horse and Burro Advisory Board. Congress created the Advisory Board in the Wild Free-Roaming Horses and Burros Act to consist of people with "special knowledge about the protection of horses and burros" who can provide advice "on any matter relating to wild free-roaming horses and burros and their management and protection." 16 U.S.C. § 1337. In nominating me to serve on the Advisory Board, Congressman Grijalva described how "[t]he federal government, acting through the BLM, has a responsibility to humanely manage wild horses and burros in a transparent and open manner." Congressman Grijalva nominated me because, as he put it, I "always seek[] to create humane sustainable management policies with a dialogue-first approach to resolving conflicts." When nominating me for the Advisory Board Congressman Grijava further explained that "[d]eveloping a strategy that limits roundups and decreases reliance on holding facilities, allowing herds to roam the range as they are intended, requires additional reforms and changes to current policy."

4

9.      In March 2016, the Secretaries of the Interior and Agriculture appointed me to serve on the BLM's National Wild Horse and Burro Advisory Board. In its announcement of my appointment, the BLM noted my experience as a documentarian, and my long history of advocacy for the preservation and welfare of wild horses as the founder and Executive Director of the Cloud Foundation. In that same announcement, the BLM noted that the "Advisory Board advises the BLM . . . on the management and protection of wild free-roaming horses."

10.     I consider my service on the Advisory Board to be a very serious responsibility that requires me to provide informed input on the BLM's policies and practices for managing wild horses.

11.     On February 15, 2018, on behalf of The Cloud Foundation, I submitted comments on the Preliminary PMWHR Bait/Water Trapping Gather and Fertility Control Environmental Assessment. In those comments, although we supported the continued use of fertility control for the herd, I expressed concern that removals beyond the inbred brothers, Parry and Oak, will not allow for meeting the objectives outlined in the 2009 PMWHR HMAP, i.e., maintaining the genetic viability of the herd and managing for unique colors and Colonial Spanish markers. The tiered structure of the proposed removal only took into account the matrilineal genetic lines, with no regard to preserving the *patrilineal* genetic lines. As I explained, focusing on only the matrilineal line could result in the accidental elimination of an important bloodline. This is especially important given the small size of the herd and the rare Colonial Spanish markers still remaining in the herd. Indeed, as I also explained in our comments, the removal of any horses that are buckskin, chestnut, sorrel and palomino could result in the loss of these colors in the future, as reported by Dr. Phillip Sponenberg, an expert on the demographics of the Pryor Herd. I also expressed concerns regarding several inconsistencies in the data BLM relied upon in

reaching its decision to remove so many horses. For example, I pointed out that BLM's population projections are incorrect. For example, BLM predicted that 12 foals would be born in 2018, and that the herd would experience a total death loss of 6 adults—meaning there would be an overall increase in the population. This prediction relies on the illogical assumption that even *if* 12 foals are born this year, there will be no foal mortality, even when, as I pointed out to BLM, previous years have shown foal mortality to be a significant factor in herd demographics. Indeed, only 5 out of 8 foals born in 2017 survived. Moreover, BLM's prediction fails to account for the fact that the age structure of the Pryor Herd is heavily weighted towards older individuals, meaning that it is likely that more than six adults will die in a given year. Thus, because the population is already in decline with more deaths than births, and the PZP treatments appear to be effectively limiting births, we explained to BLM that there is no need to conduct any removals at this time (other than the inbred brothers, Parry and Oak).

12.     I also pointed out that the current Pryor Herd Appropriate Management Level (AML)—the number of wild horses and burros that can thrive in balance with other public land resources and uses— does not take into account the Administrative Pastures, which had been reopened for wild horse use in 2016, yet was excluded from the AML calculation BLM purportedly did later that same year. The Administrative Pastures consist of over 6000 acres. Historically, the area was used as a holding space during large roundups, *see* Pl. Ex. Q, but in 2016, BLM began to remove the fence enclosing the pastures, implementing the decision made in the 2015 Approved Resource Management Plan to include the Administrative Pastures in the Herd Management Area for the Pryor Herd, *see* Pl. Ex. I. According to BLM's own calculations, there are 136.5 Animal Unit Months (AUMs) associated with the Administrative Pastures. *See* Pl. Ex. Q. The BLM Handbook defines an AUM as the amount of forage necessary to support

one adult horse for a period of one month. AUMs can be expressed as the year-round carrying capacity by dividing the total AUMs by 12 months, thus yielding the number of animal units (i.e., horses) the land can support over 12 months. Here, 136.5 AUM/12 months provide a carrying capacity of 11.375 animal units, or 11 horses. In other words, the addition of the Administrative Pastures to the Pryor Herd Management Area should increase the AML by 11 horses. However, BLM did not include the Administrative Pastures in any of its calculations of the Pryor Herd AML.

13.     In 2016, after Friends of Animals sued BLM, alleging that the AML for the Pryor Herd was too low, BLM purported to recalculate the AML, but *did not include the Administrative Pastures* in that recalculation, even though the entire northern part of the fence that had enclosed the area had been removed—allowing the horses to access the pastures—and plans had been made to remove the rest. In other words, the current AML does not account for an entire swath of public land that is marked for wild horse use, and a portion of which I have personally observed wild horses using for the past two winters. *See* Photo Attach. 1 (picture of Pryor horses using the Administrative Pastures). Thus, as we explained in our comments on the Preliminary EA, the AML should be reevaluated and increased accordingly. I also noted that an AML of 120 is simply "not high enough for a genetically healthy population, particularly if rare Spanish markers found in the Pryor Herd are to be retained." Indeed, Dr. Gus Cothran, an equine geneticist, has long maintained that a population size of *at least* 150-200 adult individuals is *required* to maintain the genetic viability of the of the herd.

14.     On June 28, 2018, I requested a meeting with BLM's Billings Field Office to discuss the Preliminary EA. In attendance were myself; Linda Hanick, a Cloud Foundation Board Member; Linda's husband Vic Hanick, a frequent visitor to the horse range; Jerry Bertola,

BLM's Program Manager for the Montana Dakota Region; and David Lefevre, BLM's Acting Field Manager. Neither of the BLM officials present had experience maintaining wild horse herds for genetic health and viability. The meeting lasted for 2.5 hours, and touched on wide ranging topics, including genetic health and color genetics. I explained the importance of maintaining narrow genetic lines and preserving unique Spanish Colonial markers. I discussed BLM's proposed tiered removal system, and explained why removing the horses identified as candidates for removal would harm the genetic viability of the Pryor Herd.

15.     On August 3, 2018, BLM released the Final EA. I was utterly shocked by the final decision, which unquestionably threatens to completely decimate this rare herd. While in the Preliminary EA, BLM proposed a "tiered" system that listed horses proposed for removal in three different "tiers," it did not state that any particular horses *would in fact* be removed, nor provide a proposed list of individuals for removal. However, the list of horses slated for removal in the Final EA included horses from all three "tiers," and whose removal, as we had explained in our June 28, 2018 meeting with BLM, would compromise the genetic viability of the Pryor Herd, the only real operating Spanish Colonial herd in existence.

16.     BLM's action is particularly troubling given the fact that a 2009 roundup and removal of Pryor horses from U.S. Forest Service and BLM land eliminated an entire sub-herd from the genetic pool. I personally observed the roundups, and have seen how the impacts of this action have already adversely impacted the genetic viability of the Pryor Herd. The 2009 action removed the Pryor horses that resided on Forest Service land, in the Custer National Forest, and 31 additional horses that resided on the designated range. The elimination of the horses living in the Custer National Forest compromised the genetic viability of the herd, as this removed an entire array of bloodlines that could have mixed with the Pryor horses living on BLM land,

providing new outcrosses and combinations. The 2009 action stands as a bottleneck event, shrinking the genetic pool of the Pryor Herd to the point that it is now hanging by a thread.

17.     Moreover, BLM has failed to fully undertake the range improvements detailed in the 2009 Herd Management Area Plan. For example, although BLM has completed the specified water catchment projects, it has not completed any seeding of native grass species. *See* 2009 Herd Management Area Plan at 21-22. This is true even where the native forage is deteriorated due to BLM's own actions. For example, in areas where BLM baited and trapped Pryor horses in 2015, the horses completely denuded the area atop the mountain, creating a dustbowl. These areas would greatly benefit from reseeding, yet BLM has yet to take any action to ameliorate the situation. It is therefore disingenuous for the agency to claim that it must remove horses due to range deterioration when it has failed to take the necessary action to re-seed the area, as well as prevent and mitigate such deterioration when trapping horses.

18.     Based on my personal and professional knowledge and my extensive experience studying and documenting the Pryor Herd, removal of the seventeen horses identified in the Final EA will decimate the genetic viability of the Pryor Herd for several reasons:

   a. BLM's projection of 8% recruitment is contrary to our observations of the Pryor Herd. BLM claims that wild horse population recruitment under current management and fertility control treatments has been reduced from 17.5% to 8%, which equates to 12-13 foals born annually with about 8-10 foals surviving to 1 year of age. However, in 2017, 8 foals were born, 2 of which died and 1 of which was removed. Therefore, only 5 foals were added to the herd. Meanwhile, 12 adult horses died during that year. Considering the fact that 5 foals were added to the herd while 15 total horses died or were removed (12 adults and 3 foals), *the mortality rate is twice the actual recruitment rate*. This trend *will likely continue* due to current management strategies that are already being implemented. As I pointed out in The Cloud Foundation's comments on the Preliminary EA, *mortality is currently exceeding births*, and that trend is expected to continue due to the herd's population dynamics being heavily weighted towards older, non-breeding individuals. Moreover, the population will continue to decline due to the continued administration of PZP and resultant sterilization of mares. Therefore, *it*

*is evident to anyone who knows this herd that BLM's assumptions regarding population growth do not accurately reflect the data*. To the contrary, the data indicate that BLM's current range management is successfully decreasing the population (e.g., through the administration of PZP, natural mortality of older horses, foals, etc.). Therefore, BLM should wait and monitor the success of those measures before taking such drastic and catastrophic action that will have devastating, irreversible impacts on the Pryor Herd.

b.  In its Final EA, BLM explained for the first time, that it intended to guard against impairment of the genetic viability of the herd by leaving one offspring of each mare on the range. In the Preliminary EA, the primary horses targeted for removal were those that are third foals or more of a given mare. After that, second foals of a given mare would be targeted for removal only if the number of Pryor horses exceeded AML by 5%. In the Final EA, however, it appears that the number of offspring per mare was the primary factor for determining whether a particular horse would be considered for removal. After first listing the two inbred horses Oak and Parry for removal due to health concerns, BLM considered the remaining 35 horses between 1 and 4 years of age—the "target" age group for the action— and determined whether each horse had siblings on the range. If so, and if the horse had no other "special" characteristics (e.g., unique coloring or rare patrilineal line), it was slated for removal. The chart below is adapted directly from the Final EA:

| Removed | | Not Considered for Removal | |
|---|---|---|---|
| **Horse** | **Reason Removed** | **Horse** | **Reason Not Considered** |
| Orlando | Greta's 6th foal | Oracle | Hataalii's 2nd foal; 1st foal was removed |
| *Oak* | *Inbred* | Oglala | Prevent patrilineal line from being eliminated |
| Outlaw Lady | Helenium's 3rd foal | Oro | Maia's 1st foal |
| Prospera | Fiasco's 5th foal | Oklahoma | Lariat's 1st foal |
| Okomi | Firestorm's 6th foal | Oceana | Galadriel's 1st foal |
| Pele | Fool's Gold's 2nd foal | Orielle | Inocentes' 2nd foal; 1st foal was removed |
| *Parry* | *Inbred* | Okiotak | Ketchikan's 1st foal |
| Petra | Galena's 5th foal | Phantom | Prevent bloodlines from being eliminated fool's crow |
| Pegasus | Ireland's 11th foal | Cloud's Pride | Rare color |
| Quasar | Kitalpha's 2nd foal | Banjo Paterson | Rare color |
| Quanah | Halcyon's 4th foal | Petite Colour | Kohl's 1st foal |
| Quintasket | Helenium's 4th foal | Prima | Nova's 1st foal |
| Quaid | Greta's 7th foal | Patriot | Jacinta's 2nd foal; 1st foal was removed |
| Quillan | Ireland's 12th foal | Pax | La Nina's 1st foal |
| Quahneah | Washakie's 13th foal | Penn | Prevent rare patrilineal line from being eliminated |
| Rio | Jacinta's 4th foal | Pilar | La Brava's 1st foal |
| Morning Reverie | Hataalii's 4th foal | Quintana | Prevent patrilineal line from being eliminated |
| | | Rigel Starr | Prevent bloodlines from being eliminated |
| | | Ryden | Jasmine's 1st foal |
| | | Ruby | Juniper's 1st foal |

*See* Final EA at 10.

However, leaving one offspring per mare will *not* by any means ensure that these bloodlines will continue, and this decision threatens the loss of several, already narrow genetic lines. Based on the history of this herd, BLM has no basis for assuming that a single remaining offspring will survive and reproduce successfully. Foal mortality is a serious concern in the harsh environment of the Pryor Mountains. Predation by mountain lions, disease or injury, and extreme weather events are constant threats to foal survival. In 2004, all the foals on the mountaintop died. This unusually high mortality was likely due to mountain lion predation. A single offspring simply cannot shoulder the burden of carrying on an entire genetic line in such conditions. Even the Pryor Mustang Center—which for years operated under a Memorandum of Understanding with BLM to share a database of demographic data—stressed in its comments on the Preliminary EA that at least two offspring are necessary to preserve narrow genetic lines, some of which are already hanging by a thread. Moreover, because the population is heavily weighted towards older, nonbreeding horses, a single stochastic event (i.e., an extreme weather event, fire, etc.) that killed all of the older horses and young foals would devastate the population. Indeed, in 1977, an extreme ice storm killed all of the foals and old horses in a single winter, bringing the herd down to a mere 77 individuals. The removal of all but one foal for each bloodline will lead to the elimination of entire genetic lines, and is a recipe for disaster.

c.  BLM listed for removal several mares that are the last breeding individuals of their line. For example, BLM scheduled Quahneah for removal, the last breeding mare of the Baya/Washakie line. The two older mares in her line have no offspring and are sterile. Therefore, her removal will eliminate the Baya/Washakie line from the Pryor Herd.

d.  When evaluating two brother-sister sibling pairs for removal, BLM decided to remove the mares, Morning Reverie and Prospera, while leaving their bachelor stallion brothers, Oracle and Nodin, respectively. This is problematic given the social behavior of Pryor Mountain stallions. Pryor stallions engage in aggressive and dangerous battles to obtain breeding rights to a mare or a band of mares. As a result, very few Pryor stallions become band leaders and reproduce. Therefore, it cannot be assumed that Oracle and Nodin will both become band leaders and pass on their genetic material. Moreover, the mothers of both pairs are on PZP and may no longer be reproducing mares. Therefore, removing Morning Reverie and Prospera threatens the elimination of their respective matrilineal lines.

e.  BLM's decision to remove horses with unique coloring threatens to eliminate unusual colors, in violation of the Final EA's direction to "manag[e] to maintain rare or unusual colors in order to prevent any one color becoming dominant or being eliminated." For example, Quintasket is one of only six sorrels in the entire Pryor Herd. Likewise, Petra is a stunning example of the Spanish Mustang

12

phenotype described by Dr. Sponenberg. These horses cannot be removed without threatening the elimination of their respective phenotypes. I have attached to this Declaration photographs of these horses to demonstrate their unique coloring. *See* Photo Attach. 2 (Quintasket); Photo Attach. 3 (Petra); *see generally* Photo Attachs. 4-6 (showing the beautiful and unique color palette of the Pryor Herd).

    f.    BLM proposes to allow the removal of injured horses, yet fails to define what constitutes an "injury." Battling stallions often walk away with open wounds or injuries, but nevertheless survive and can even go on to reproduce. Indeed, one of the band stallions, Chief Joseph, is presently lame, yet still defends his mares courageously and adeptly. I've personally witnessed horses with broken legs recover and live—and breed—successfully for many years. It is very troubling to think that those animals, having proven themselves in the gauntlet of natural selection, would nevertheless be removed by BLM, unable to pass on their spirited genes to the next generation, especially when BLM is currently engaged in activities that *increase* the likelihood of injuries. This month, I returned to the mountaintop and observed the bait that BLM has already put out in anticipation of the September capture, as described in the Final EA. During this visit, I witnessed horses fighting over the bait, some walking away with nonlethal open wounds. I am fearful that BLM will use these nonlethal injuries as an excuse to remove even more horses from the Pryor Herd. The proposed removal of "injured" horses is an invasive and dangerous policy change.

19.    If BLM had provided its list of proposed removals prior to the Final EA, The Cloud Foundation and I would have endeavored to work with the agency to provide detailed family trees and genetic and color/phenotype information to explain why certain horses should not be removed from the herd if BLM is to "to prevent bloodlines from being eliminated while maintaining a core breeding population," as stated in its 2009 Herd Management Plan. *See* 2009 Herd Management Plan at 27. These reasons include:

| Horse | Reason Should Not be Considered for Removal |
|---|---|
| Orlando | Actively battling to win mares – a very aggressive individual |
| Prospera | Would leave stallion sibling to carry on line alone; cannot guarantee bachelor stallion sibling will become band stallion and pass on genetics |
| Okomi | Member of narrow patrilineal line; would leave single sibling to carry on Scarlett's line |
| Pele | Would leave stallion sibling to carry on line alone (Nickle); cannot guarantee sibling will become band stallion and pass on genetics |
| Petra | Member of narrow line on father's side; exceptional Spanish conformation |
| Pegasus | Lead mare to band stallion Missoula |
| Quasar | Member of narrow line |
| Quintasket | Would leave single sibling to carry on line alone; one of 6 sorrel horses |
| Quahneah | Last breeding member of Baya/Washakie line; removal eliminates line. |
| Rio | One of two members of outcross line from horses on Forest Service land; both are stallions, so cannot guarantee either will pass on rare genetics |
| Morning Reverie | Would leave stallion sibling to carry on line alone; cannot guarantee bachelor stallion sibling will become band stallion and pass on genetics |

20.     If BLM proceeds with its proposed removal of 17 horses from the Pryor Herd, I will suffer irreparable and irreversible injuries to my personal, professional, and aesthetic interests in this Herd. For decades, I have seen these horses inspire people with their beauty and their power, and I have taken great joy in sharing their rich lives with audiences worldwide. I never fail to be blown away by the wide color spectrum, and delight in seeing the diverse array of grullas, bays, blacks, sorrels, duns, and buckskins on display in summer atop the mountain. I have known each of these horses since they were tiny foals. In some instances, I watched them on their first days on this planet. I have known their mothers, fathers, and grandparents, and I know all of their names. They are like family to me. Their removal would be, in a word, devastating, because it would unquestionably compromise the genetic viability of the herd and

14

eliminate several narrow genetic lines. Extinction is forever. I consider it my personal and professional calling to protect Cloud's family and herd from such devastation.

21.     The Cloud Foundation would also be irreparably and irreversibly harmed by BLM's decision to permanently remove 17 horses from the Pryor Herd. It is dedicated to "preventing the extinction of Cloud's herd through education, media events and programming, and public involvement." Should BLM destroy the genetic viability of the herd, it will severely impair The Cloud Foundation's core mission to preserve this unique and inspiring herd, and certainly impair the Foundation's ability to raise funds to protect these and other wild horses in the future.

22.     Finally, the loss of the Pryor Herd would not just be a loss to me, personally, and to The Cloud Foundation. It would be a loss to the surrounding community, which benefits significantly from the tourism generated by the Pryor Herd—people come from all over the world to observe, photograph, and study these very special horses, which brings much needed revenue to the local restaurants and hotels which heavily advertise and promote their proximity to the Pryor horses. The loss of the genetic viability of this herd would also be felt all around the world. I constantly hear from people in other states, countries, and continents who tell me that they feel like they know these horses personally due to my documentary work and the stories I've told, as well as the pictures I and so many other wonderful photographers circulate. Cloud and his family are historically significant. In fact, Cloud was recognized in the Congressional Record as an important ambassador for all wild horses. It would be a travesty for BLM to manage this herd into extinction.

23.     The irreversible injuries caused to me, The Cloud Foundation, and other members of the public can only be prevented by a court order prohibiting BLM from conducting any removals of Pryor Herd horses that would impair their genetic viability.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States, that to the best of my knowledge the foregoing is true and correct.

Executed this 23rd day of August, 2018 in Colorado Springs, CO.

_____

Ginger Kathrens



Photo Attach. 1



Photo Attach. 2



Photo Attach. 3



Photo Attach. 4



Photo Attach. 5



Photo Attach. 6