Rebecca K. Smith
Public Interest Defense Center, P.C.
PO Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Katherine A. Meyer
Elizabeth L Lewis
Meyer Glitzenstein & Eubanks, LLP
4115 Wisconsin Ave., N.W. Suite 210
Washington, D.C. 20016
202-588-5206 (O)
202-588-5049 (fax)
Kmeyer@meyerglitz.com
Llewis@meyerglitz.com

Attorneys for Plaintiffs

UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF MONTANA


| | | |
|---|---|---|
| GINGER KATHRENS,<br>107 South 7th Street<br>Colorado Springs, CO 80905, | ) <br> ) <br> ) <br> ) | |
| THE CLOUD FOUNDATION,<br>107 South 7th Street<br>Colorado Springs, CO 80905, | ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | |
| v. | ) <br> ) | Civ. No. 18-00125 (SPW) |
| RYAN ZINKE, Secretary<br>Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C.  20240, | ) <br> ) <br> ) <br> ) <br> ) | **AMENDED COMPLAINT** |
| BRIAN STEED, Acting Director<br>Bureau of Land Management<br>1949 C Street, N.W.<br>Washington, D.C.  20240, | ) <br> ) <br> ) <br> ) <br> ) | |
| DAVID LEFEVRE, Acting Field Manager | ) | |

Bureau of Land Management )
Billings Field Office )
5001 Southgate Drive )
Billings, Montana 59101, )
)
            Defendants. )

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This case challenges the August 3, 2018 decision by the Bureau of Land Management ("BLM") to remove 17 young wild horses from the world's most famous herd of wild horses—the Pryor Mountain Herd—which live on the public lands in the Pryor Mountain Wild Horse Range ("PMWHR") located in the southeastern portion of Carbon County, Montana and northern Big Horn County, Wyoming. Although this population of wild horses is already precariously low, and BLM's 2009 Herd Management Plan—to which the challenged decision is "tiered"—emphasizes the need "to maintain a viable breeding herd which could perpetuate the characteristics of the Pryor Mountain wild horses," BLM's recent decision to remove 17 young horses from the current population of approximately 154 horses will decimate the genetic viability of this herd and thereby destroy its ability for all time to carry forward the unique genetic characteristics of these very special horses.

2.      Genetic tests have long confirmed that the Pryor horses are rare descendants of New World "Spanish" breeds that were brought to this country in the early 1500s. Because of their rarity and the public's fascination with these particular horses, BLM long ago committed itself to manage these horses "for a phenotype reminiscent of a Colonial Spanish Type horse in order to prevent the loss [of] 'Spanish' characteristics," including managing the herd "to maintain rare . . . colors in order to prevent any one color becoming . . . eliminated," and "to

prevent bloodlines from being eliminated while maintaining a core breeding population." 2009
Herd Management Plan at 27.

3.      Nevertheless, despite this prior commitment and having been informed by experts
on the Pryor Herd—including BLM's own Wild Horse and Burro Advisory Board member,
Plaintiff Ginger Kathrens—that its proposal to remove 17 young horses will *destroy the herd's
genetic viability*, and despite the fact that the BLM's own Handbook states that "a total
population size of about 100-200 animals" is "currently recommended to maintain an acceptable
level of genetic diversity within reproducing [wild horse] populations," BLM has decided to go
forward with its removal action **as early as September 2, 2018**.

4.      BLM's decision violates the Wild Free-Roaming Horses and Burros Act ("Wild
Horse Act" or "WHA"), 16 U.S.C. §§ 1331-1340, which requires BLM to protect these horses as
"wild" and "free-roaming" components of the public lands, 16 U.S.C. § 1333(a), and the
agency's implementing regulations, 43 C.F.R. § 4700.0-6, which require it to manage all wild
horses "as self-sustaining populations of healthy animals." It also contravenes BLM's own prior
commitment set forth in the 2009 Herd Management Plan to manage these particular horses to
maintain their genetic viability. Accordingly, BLM's decision is also arbitrary and capricious and
an abuse of discretion within the meaning of the Administrative Procedure Act ("APA"), 5
U.S.C. § 706(2).

5.      BLM's decision and its related 2016 "Recalculation" of the Appropriate
Management Level ("AML") which both employ a maximum AML of 120 horses for this herd,
also violate the WHA, the agency's implementing regulations, and the agency's Handbook,
because this AML fails to take into account both the *actual* number of horses the 2016
Recalculation concluded could be sustained (121), fails to take into account that in 2015 BLM

3

added an additional 3,000 + acres of public land to the PMWHR which can accommodate up to an additional 11 wild horses, and because in "re-calculating" the AML, BLM failed to comply with the appropriate process, as it explained to this Court was required the last time someone challenged BLM's decision to remove horses from the PMWHR, *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1123 (D. Mont. 2016), including compliance with the National Environmental Policy Act ("NEPA").

6.      BLM's decision also violates NEPA, 42 U.S.C. §§ 4321-4370f, and that statute's implementing regulations, and is also arbitrary and capricious and an abuse of discretion within the meaning of the APA, 5 U.S.C. § 706(2), because although the decision is "tiered" to the 2009 Herd Management Plan, it contravenes that Plan's objective to remain the genetic viability of the Pryor Herd, because the agency failed to consider obvious alternatives—such as removing fewer horses while continuing to administer the immuno-contraception vaccine, Porcine Zona Pellucida ("PZP"), which has already proven to be effective in reducing wild horse populations—and because BLM failed to consider the direct, indirect, and cumulative impacts of its decision on the genetic viability of the Pryor Herd, and also failed to prepare an Environmental Impact Statement ("EIS").

## JURISDICTION

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## PARTIES

8.      Plaintiff Ginger Kathrens is an Emmy Award-winning producer, cinematographer, writer, editor, and public speaker. She has dedicated the past 24 years of her life to the observation and documentation of wild horses in the West, with a particular focus on the Pryor Herd. She has studied and documented the Pryor Herd since 1994 and produced three

4

award-winning films that chronicled the life of Cloud, a wild stallion of that Herd, and his progeny that aired on the PBS's *Nature* series—*Cloud: Wild Stallion of the Rockies; Cloud's Legacy: The Wild Stallion Returns; and Cloud: Challenge of the Stallions.* Ms. Kathrens has also written, edited, and produced over two dozen segments of the *Wild America* series for PBS, and has filmed wild horses for National Geographic, the Discovery Channel, Animal Planet, and the BBC. She has also authored three natural history books about Cloud and his herd, and written dozens of published articles about wild horses and burros. Ms. Kathrens has kept track of the members of the Pryor Herd since the mid-1990s and knows each of the horses of that herd by name, including their familial bloodlines. Ms. Kathrens is also the founder and Executive Director of the Cloud Foundation, which is also a plaintiff in this case.

9.     Ms. Kathrens is also a member of the BLM's 9-member statutorily created advisory committee, the National Wild Horse and Burro Advisory Board, and was appointed to that body by BLM *because* of her wild horse expertise, particularly with respect to the Pryor Herd.

10.     The BLM's decision to remove 17 young horses from the Pryor Herd adversely affects Ms. Kathrens' personal, aesthetic, and professional interests in preserving the genetic integrity of this Herd because, as she explained to BLM during the public comment period on its Preliminary Environmental Assessment, the removal of so many horses, and especially those *particular* horses, will decimate the genetic viability of the Herd and eliminate horses with rare colors, and thus the rare qualities of the Herd will inevitably be extinguished for all time. These injuries are directly caused by BLM's actions, and a favorable decision will redress these injuries by enjoining BLM from taking any measures that will impair the genetic viability of the Herd.

11.     Plaintiff The Cloud Foundation ("TCF") is a 501(c) (3) nonprofit organization dedicated to the preservation of wild horses and burros on public lands in the western United States, with a particular focus on the preservation of the Pryor Herd. It has hundreds of thousands of supporters throughout the United States who follow and support its work. TCF does advocacy work on behalf of the Pryor Herd and raises funds from the public and Foundations in order to continue this very important work. Its professional interests and entire raison d'être are severely jeopardized by BLM's decision to remove 17 young horses from the Pryor Herd because this decision will forever destroy the Herd's unique genetic makeup, thereby severely impeding TCF's ability to continue advocating on the Herd's behalf and raising funds from the public and Foundations for that purpose. A favorable ruling for TCF will redress these injuries by prohibiting BLM from implementing measures that will destroy the genetic viability of the Pryor Herd, thereby making it possible for TCF to continue its advocacy on behalf of these animals.

12.     Defendant Zinke is the Secretary of the Department of the Interior, the parent agency to BLM, and, accordingly, he is ultimately responsible for the decision at issue here.

13.     Defendant Steed is the Acting Director of BLM, and therefore he is also responsible for the decision at issue.

14.     Defendant Lefevre is the Acting Field Manager for BLM's Billings Field Office and signed the Decision Record that Plaintiffs challenge. He is therefore also responsible for the challenged decision.

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

### I.    Pertinent Statutory and Regulatory Framework

#### A.    The Wild Horse Act

15.    Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the WHA in 1971 to ensure that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and that they are "considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

16.    The Wild Horse Act provides that the Secretary of Interior "shall manage wild free-roaming horses and burros as components of the public land . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). To further this objective, the statute provides that "[a]ll management activities shall be at the minimum feasible level." *Id.* The Secretary's duties have been delegated to BLM.

17.    To further the overall objectives of the WHA, BLM's implementing regulations provide that "[w]ild horses and burros shall be managed as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat." 43 C.F.R. § 4700.0-6.

18.    Each area "established for the maintenance of wild horse and burro herds" is called a "Herd Management Area" ("HMA"). 43 C.F.R. § 4710.3-1. BLM is tasked with establishing the "appropriate management level" for each HMA, which is "expressed as a population range within which [wild horses] can be managed for the long term in a given management area without resulting in rangeland damage." BLM Handbook at 4.2.1; *see also* 16

U.S.C. § 1331(b)(1) (authorizing BLM to establish AMLs). The BLM establishes both a low and high AML. BLM Handbook § 4.2.1. The upper limit is the "maximum number of [wild horses] which results in a [thriving natural ecological balance] and avoids deterioration of the range." *Id.*

19.     The BLM may also "evaluate" an AML, and when it does, should consider, inter alia, "[c]hanges in environmental conditions which may have occurred since the AML was established," including "an increase . . . in the available forage." BLM Handbook § 4.2.2.2. BLM's Handbook further states that "[a]n interdisciplinary and site-specific environmental analysis and decision process (NEPA) with public involvement is required to establish or adjust AML." *Id.* § 4.2.2.

20.     When, based on the AML and other factors, BLM determines that (a) there is an overpopulation of wild horses in a given area of public lands and (b) those horses must be removed, the agency may undertake measures to remove "excess" animals "to restore a thriving natural ecological balance." 16 U.S.C. § 1333(b).

21.     According to BLM's Handbook, "[a] minimum population size of 50 effective breeding animals (i.e., a total population size of about 150-200 animals) is currently recommended to maintain an acceptable level of genetic diversity within reproducing WH&B [wild horse & burro] populations." BLM Handbook § 4.4.6.3 (citing Cothran, 2009).

**B.**     **The National Environmental Policy Act**

22.     Congress enacted the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331-4370f, to ensure that federal agencies consider the environmental impacts of their actions before taking them, and to further ensure that they consider all reasonable alternatives to proposed actions that may have less adverse impacts on the environment.

23.     To meet these objectives, all agencies are required to prepare an Environmental

Impact Statement ("EIS") for major federal actions that may "significantly affect" the

environment. *Id.* § 4332(C). The Council on Environmental Quality ("CEQ")—an agency within

the Executive Office of the President—has promulgated regulations implementing NEPA that

are "binding on all Federal agencies." 40 C.F.R. § 1500.3. These regulations provide that in

determining whether an EIS is required with respect to a particular proposed action, an agency

must prepare an Environmental Assessment ("EA") that analyzes the environmental impacts of

the proposed action as well as alternatives. *Id.* §§ 1501.4(c), 1508.9. The EA must "briefly

provide sufficient evidence and analysis for determining whether" the environmental impacts are

significant such that an EIS is required. *Id.* § 1508.9. To that end, the EA must analyze the

"direct" impacts of the proposed action, i.e., those that result directly from the management

action, the "indirect" impacts, which include those caused by the action that are later in time but

are "still reasonably foreseeable," and the "cumulative" effects, which include those impacts that

"result[] from the incremental impact of the action when added to other past, present, and

reasonably foreseeable future actions." *Id.* §§ 1508.7, .8, .9.

24.     An agency must analyze reasonable alternatives to the proposed action, regardless

of whether it prepares an EIS or an EA. 40 C.F.R. § 1508.9.

25.     In determining whether an EIS is required, an agency must consider whether the

proposed action may have "significant" effects on the environment. 40 C.F.R. § 1508.27. The

significance determination is based on factors such as "the degree to which the possible effects

. . . are highly uncertain," "the degree to which the effects . . . are likely to be highly

controversial," whether the action establishes a "precedent for future actions with significant

effects" or "represents a decision in principle about a future consideration;" or whether the action

9

threatens a violation of Federal law. 40 C.F.R. § 1508.27(b). The presence of any of these factors normally requires the preparation of an EIS.

26.     If, in preparing the EA, the agency finds that the action "will not have a significant effect" on the environment, it must issue a Finding of No Significant Impact ("FONSI"), which must present the reasons for the agency's determination. *Id.* § 1508.13.

27.     At the time of its decision, the agency must prepare and issue "a concise public record of decision." 40 C.F.R. § 1505.2. The Decision Record ("DR") must state the agency's decision, identify the alternatives considered, and describe the means adopted to avoid or minimize environmental harm. *Id.*

28.     An agency may "tier" an EA regarding specific actions to a previously issued more general EIS that covers such actions and other related actions. 40 C.F.R. § 1502.20. However, when it does so, the narrower action must be "clearly consistent" with the decision associated with the broader action. Final EA at 2.

## II.    <u>Pertinent Factual Background</u>

### A.    <u>The Pryor Mountain Wild Horse Range</u>

29.     The Pryor Mountain Wild Horse Range ("PMWHR") is located in the southeastern portion of Carbon County, Montana, and northern Big Horn County, Wyoming. 2009 Herd Management Plan at 3. The majority of the PMWHR was created 50 years ago in 1968 by Order of the Secretary of the Interior, and was revised in 1969—two years before enactment of the WHA. *Id.* The present boundary encompasses more than 38,000 acres of public land. *Id.* at 4. The PMWHR is "primarily managed for wild horses, archeological, recreation, wildlife and scenic values." *Id.* at 49.

30.     While the exact origin of the wild horses that live in the PMWHR is not entirely known, it is generally accepted that they are descendants of New World "Spanish" breeds (saddle type horses) and related to European Iberian breeds. Herd Management Plan at 8. Thus, it is believed that these horses were brought to this country by the Spanish in the early 1500s. *Id.* at 46. Genetic tests conducted in 1992 by Dr. Gus Cothran, of Texas A&M University's Department of Veterinary Integrative Bioscience, identified the Pryor horses as descendants of the Spanish breed: the Pryor horses carry a rare allele variant that is traced back to original New World Spanish type horses that were developed from the original Spanish and Portuguese (Iberian) horses that were brought to the Americas. *Id.* at 8. Because these horses existed on these lands when the WHA was enacted in 1971, they are protected under the WHA.

**B.     BLM's 2009 Herd Management Plan**

31.     In 2009, BLM issued an EA for the purpose of analyzing the potential environmental consequences of updating the PMWHR Herd Management Area Plan ("2009 Plan" or "HMAP")—the document that governs management actions with respect to wild horses in the PMWHR. HMAP at 1.

32.     The purpose of the 2009 Plan was to re-establish the AML for the Pryor Herd, develop prescriptions for habitat limitations, identify opportunities for improvement, and emphasize stabilization of ecological conditions. HMAP at 1. As explained, the Plan "would serve as the primary activity plan for the PMWHR." *Id.*

33.     As further explained by BLM, the Plan was issued in conformance with the Resource Management Plan for the Billings Resource Area, whose objectives include "maintain[ing] a viable breeding herd which could perpetuate the characteristics of the Pryor Mountain wild horses." HMAP at 11. As the Plan further stated, "[u]ltimately, the [PMWHR]

11

has the potential to support up to 179 wild horses yearlong." *Id.* at 11. As the Plan also stressed, "[t]he emphasis in herd management will be to limit the reproduction rate and perpetuate the characteristics of the Pryor Mountain Wild Horses," which will "necessitate beginning a selection program to retain only those wild horses with confirmation, color and breeding (genetic) characteristics typical of the Pryor Mountain wild horses." *Id.* The Plan reiterated that "[t]he primary objective will be to maintain a healthy, viable herd that displays the characteristics typical of the Pryor Mountain wild horses." *Id.* at 12.

34.    The 2009 HMAP established the AML for the PMWHR at 90-120 wild horses, and explained that the population would be managed using a combination of population control techniques, including gathers, fertility control, and natural means. HMAP at 19-20. BLM stressed that the population would be managed "for a phenotype reminiscent of a Colonial Spanish Type horse in order to prevent the loss of 'Spanish' characteristics," which would include managing for "rare or unusual (for the Pryors) colors in order to prevent any one color becoming dominant or being eliminated," and "to prevent bloodlines from being eliminated while maintaining a core breeding population." HMAP at 27.

35.    The AML was based on a 2007 range evaluation. HMAP at 1. Further, BLM explained that "the establishment of AML is not intended to be a onetime determination but rather a fluid process where adjustments are made based upon environmental changes and management needs." HMAP at 17.

36.    In the accompanying Record of Decision for the 2009 HMAP, BLM stated that "[m]onitoring data will continue to be collected and the AML will be re-calculated within five years or after the revision of the Billings [Resource Management Plan] whichever comes first." HMAP Decision Record at 8.

37.     The 2009 Herd Management Plan also outlined a number of rangeland improvements that were "needed to meet the objectives" of the Plan—i.e., to protect both the herd and the PMWHR habitat. HMAP at 30-43.

38.     As part of the implementation of the 2009 Plan, in 2011 BLM used PZP on mares in the Pryor Herd as a means of reducing the population. Those efforts have continued to the present and have proven to be effective in dramatically reducing the population rate.

### C.     Dr. Cothran's 2013 Analysis

39.     On August 23, 2013, Dr. Gus Cothran, the expert geneticist upon whom BLM relies in making wild horse management decisions, issued a "Genetic Analysis of the Pryor Mountains Wild horse Range." Dr. Cothran found that the genetic variability levels for the herd "for all measures has been in decline," and that "there has been a general trend for decline in variations levels for the herd." He further stated that "[i]f the trend continues the variability levels of the herd could drop below the feral average within the next five to ten years," and that "[t]he best way to maintain current levels would be to increase population size if range conditions allow."

### D.     The Addition of the Administrative Pastures

40.     In May 2016, BLM added to the PMWHR an additional 3,000 + acres of land called "The Administrative Pastures" which had been closed to wild horse use prior to that time. This land was used by wild horses at the time the WHA was enacted in 1971.

### E.     BLM's "Recalculation of the AML"

41.     In July 2016, this Court issued a decision finding that BLM had acted arbitrarily and capriciously in authorizing a 2015 round-up of horses on the PMWHR without re-calculating the AML as it had told the public it would do in the 2009 HMAP. *Friends of Animals v. Sparks*,

200 F. Supp. 3d 1114, 1126 (D. Mont. 2016). As part of that decision, the Court noted that "BLM conceded during oral argument that establishing or adjusting the AML is equivalent to recalculating the AML, and is a much more involved process than reaffirming the AML." 200 F. Supp. 3d at 1123.

42.     On December 2016, BLM issued a draft Pryor Mountain Wild Horse Range Appropriate Management Level (AML) Recalculation Report ("Report"). That Draft Report stated that "[b]ased upon monitoring data adjusted for precipitation, an AML of 121 adult wild horses is the maximum number that can be maintained without damage to the range and to achieve a thriving ecological balance." Report at 11.

43.     The December 2016 Draft AML Recalculation did not take into account the addition of the Administrative Pastures to the PMWHR.

44.     On December 21, 2016, BLM sent a form letter addressed to "Interested Party" inviting comment on the Draft Report for 30 days. In response to that invitation Plaintiff TCF and others submitted comments explaining that the AML needed to be increased for several reasons, including to ensure genetic viability within the Herd and to take into account the addition of the Administrative Pastures.

45.     In September 2017, BLM posted notice on its environmental planning website stating that the December Recalculation Report had been "withdrawn."

46.     BLM did not prepare an EA, EIS, or any other NEPA analysis with respect to its December 2016 Draft AML Recalculation, never responded to public comment on that Report, and did not issue a final AML Recalculation or Decision Record regarding that matter.

F.     **BLM's Preliminary EA**

47.     On January 14, 2018, BLM issued for public comment a Preliminary EA ("PEA") to do baiting and trapping of wild horses for removal from the PMWHR, in combination with continued use of PZP on mares. As explained by the agency, the PEA was "tiered" to the 2009 HMAP. PEA at 1, 2. Stating that the current population of the herd was 165 horses, PEA at 2, BLM proposed capturing "numerous individual wild horses and bands [horse families] to selectively remove wild horses that meet the removal criteria." PEA at 8. It further explained that the proposed action "would primarily consist of removing excess wild horses 1-4 years old." PEA at 8. Multiple trap sites would be set up throughout the PMWHR by providing food to lure horses to the area, who would then be captured and removed. The captured animals would be transferred to corrals where they would be prepared for adoption. *Id.* at 9.

48.     BLM provided a chart of 20 horses that "would be removed" or were "considered for removal" based on various criteria.

49.     In addition to the planned removals, the PEA proposed continuing fertility control by administering PZP, but with some modifications, explaining that the agency "has identified fertility control as a method that could be used to protect rangeland ecosystem health and to reduce the frequency of wild horse and wild burro gathers and removals," and that "[e]xpanding the use of population growth suppression . . . is a BLM priority." PEA at 11. BLM stated that "[f]ertility control has been conducted from 2011 to 2017, with 70-80% of the mares treated each year (depending on demographics)." PEA at 3.

50.     In support of its decision, BLM stated that "[w]ild horse population recruitment"—i.e., population growth—under current management and fertility control treatments "has been reduced from 17% to 8%," and that "this equates to about 12-13 foals born

annually with about 8-10 surviving to 1 years of age." PEA at 3. It further stated that 12 foals are expected in 2018. *Id.*

51.     The PEA reaffirmed that BLM would be managing the Pryor herd with an AML of 90-120 horses. PEA at 2.

52.     The only alternatives analyzed by BLM were taking no action at all or removing excess horses each year without modifying the fertility control program. PEA at 12-13.

53.     Several organizations, including The Cloud Foundation, opposed the proposed removal plan on various grounds. TCF explained that while it supported the removal of two young horses (Parry and Oak) who are the offspring of a brother and sister who mated and will likely adapt to domestication, and that it supported the proposed modification to the PZP program, it opposed the removal of so many horses and particularly those of important genetic value to the survival of the herd. TCF pointed out that the agency's population figures and projections were based on incorrect data—i.e., the population was much lower than stated and the 8% recruitment percentage was based on erroneous assumptions because only 5 foals survived in 2017 versus the 10-12 foals BLM projected for both 2017 and 2018. TCF further explained that due to the number of older horses on the range, deaths are currently outnumbering births, and that "[w]hile just five 2017 foals remain, the birth rate is at less than half the mortality rate in the PMWHR." TCF further urged BLM to increase the AML, particularly because the Administrative Pastures had been added to the PMWHR which can accommodate up to 11 additional horses. As TCF explained, "[a] high AML of 120 is not high enough for a genetically healthy population, particularly if [the] rare Spanish markers found in the Pryor Herd are to be retained."

54.     TCF emphasized its particular concern about the genetic viability of the herd. It explained that "[t]he proposed removal of 20 young horses will render the PMWHR herd genetically non-viable," particularly because Dr. Cothran had already indicated that the variability of the herd is already in decline, and that in order to remain genetically viable, herds must be 150-200 animals.

55.     TCF also explained that it opposed the proposed removal criteria because they did not take into account the full genetic history of each animal—i.e., both the matrilineal and patrilineal genetic lines, and that "[f [ocusing on only the matrilineal line could result in the accidental elimination of an important bloodline," which is "especially important given the small size of the herd and the rare Colonial Spanish markers still remaining in the herd." TCF further explained that BLM's focus on the number of foals that a mare has *had* as a basis for removal decisions made no sense, and that instead BLM should base its decisions on the number of foals each mare has had that *remain on the range.* It further pointed out that several of the horses identified for removal "are members of narrow genetic lines," and that the removal plan "does not take into account the important matter of preserving unique colors for the PMWHR" as required by the 2009 HMAP.

56.     TCF emphasized that the 2009 HMAP had stressed the need for various rangeland improvements, noted that some of these had not been done, and asked BLM to consider implementing those measures before resorting to removal of so many young horses from the herd, and it also urged BLM to consider expanding the range to accommodate more horses.

57.     TCF stressed the importance of the Pryor Herd which is "extremely popular with wild horse enthusiasts, photographers, and tourists," and reminded BLM that "[t]hese horses provide an economic benefit through tourism dollars, both locally and to the states of Montana

and Wyoming. Indeed, TCF informed BLM that it has 500,000 active supporters who are "interested in the health and wellbeing of these animals."

58.     The Pryor Mountain Wild Mustang Center ("Mustang Center")—which partners with BLM to keep detailed records on each of the horses of the Pryor Herd, including their genetic history—also opposed the implementation of the removals contemplated by the PEA on the ground that this "would negatively affect the long-term health of the herd." The Mustang Center explained that "[s]ince 2001, a combination of fertility control and gathers has occurred in order to bring the herd closer to AML," that "these management actions, combined with natural loss, are starting to result in a population effect given the herd's declining growth rate observed in the past two years," and that "this trend will continue in the near future due to decreased foaling rates along with a significant number of older individuals that are reaching the end of their lives." Thus, it stressed, as the herd becomes smaller, "[t]he Proposed Action must . . . not negatively affect the herd during this critical time."

59.     Accordingly, the Mustang Center recommended that "gathers be used in combination with fertility to slowly help bring[] the herd toward AML," and that the removal criteria "be heavily modified in order to be consistent with the 2009 HMAP's goal of maintaining genetic diversity through management based on kinship." It therefore proposed an "alternative removal criteria system" that would allow the removal of 2-6 animals in 2018 based on each animal's specific genetic history. It emphasized that this approach is particularly feasible as a means of "promoting the long-term health of the herd" because the Pryor Herd is so well documented. Indeed, the Center stressed that it has nearly "fifty years of detailed records" on these horses, and that "[t]his level of knowledge allows for a detailed level of management that we believe will be required to allow for the long-term health, and thereby survival of the herd."

60.     Thus, both TCF and the Mustang Center, along with other commenters, pointed out many significant impacts that would result from BLM's planned removal, including the most critical impact—i.e. destruction of the genetic viability of the Pryor Herd. Other commenters specifically urged BLM to prepare an EIS on the project before moving forward.

      **G.**      **BLM's Final EA, FONSI, and Decision Record**

61.     On August 3, 2018, BLM issued its Final EA, Decision Record ("DR"), and Finding of No Significant Impact ("FONSI"). The DR explained that the agency had decided to adopt the Proposed Action and to remove 17 selected wild horses aged 1-4 from the Pryor Herd and to implement the proposed modifications to the on-going fertility control program. It further explained that under the plan mares would only be allowed to have one offspring left on the range "to carry forward into the next generation."

62.     Removal of the seventeen horses identified in the Final EA will decimate the genetic viability of the Pryor Mountain Herd for some of the following reasons:

    **a)**      BLM's decision to leave only one offspring for each mare threatens the loss of several matrilineal lines because it cannot be assumed that the single offspring remaining will survive and reproduce successfully. Should the offspring fail to survive to breed due to, e.g., predation, disease, injury, etc., the genetic line will be eliminated completely. Indeed, mountain lions have been observed dragging foals in the PMWHR. Moreover, extreme weather events, such as the ice storm in 1978, have been known to drastically reduce herd numbers. BLM failed to account for such natural sources of mortality when deciding that only one offspring should bear the weight of carrying on an entire genetic line;

    **b)**      BLM failed to take into account the older mares that are sterile or are currently on PZP when determining which individual horses to remove and, as a result, the removal of some of the selected horses would eliminate entire genetic lines. For example, BLM scheduled for removal Quahneah, who is the last breeding mare of the Baja/Washakie line. The two older mares in her line have no offspring and are sterile. Therefore, her removal would eliminate the Baja/Washakie line from the Pryor Mountain Herd. Thus, BLM must take into account the breeding status of the individual horses within a genetic line before slating any for removal.

**c)**    BLM's decision to remove the mare and leave only the bachelor stallion of brother-sister sibling pairs also threatens the genetic viability of the herd because it cannot be assumed that the bachelor stallion will become a band leader and reproduce successfully. Pryor stallions engage in aggressive and dangerous battles to obtain breeding rights to bands of mares. As a result, very few Pryor stallions become band leaders and reproduce. Yet BLM has scheduled for removal the mares of two brother-sister sibling pairs—Morning Reverie (a mare and sister to Oracle, a bachelor stallion); and Prospera (a mare and sister to Nodin, a bachelor stallion. The mothers of both pairs are no longer reproducing mares. It cannot be assumed that Oracle and Nodin will both successfully become band leaders and pass on their genetic material. Therefore, removing Morning Reverie and Prospera threatens the elimination of their respective matrilineal lines.

**d)**    BLM's decision to remove horses with unique coloring threatens to eliminate unusual colors, in violation of the 2009 HMAP's direction to "manag[e] to maintain rare or unusual colors in order to prevent any one color becoming dominant or being eliminated." For example, Quintasket,who is one of only six sorrels in the entire Pryor Herd. Likewise, Petra, who is also slated for removal, is a stunning example of a Spanish Mustang. These horses cannot be removed without threatening the elimination of their respective phenotypes.

**e)**     BLM proposes to allow the removal of injured horses, yet fails to define what constitutes an "injury." Battling stallions often walk away with open wounds or injuries, but nevertheless survive and perhaps even go on to reproduce.

63.    The Final EA acknowledged that the current population of the herd is 154 animals—not 165 as BLM stated in the Preliminary EA.

64.    The Final EA and DR did not increase the upper AML.

65.    The Final EA and DR did not take into account the addition of the Administrative Pastures to the PMWHR.

66.    The Final EA and DR did not consider any new alternatives, including those suggested by TCF and the Mustang Center—i.e., removing *fewer* animals based on their actual genetic contribution to the herd and letting the fertility control and natural causes continue to reduce the population over time.

67.     The Final EA and DR did not analyze the direct, indirect, and cumulative effects of the decision on the genetic viability of the Pryor Herd, including the impacts of past removals that have already affected the bloodlines, as well as future removals that will also have such effects.

68.     Neither the Final EA nor the DR explained to the public why the decision would *not* have adverse impacts on the genetic viability, nor did they provide any response to the detailed comments by TCF and the Mustang Center regarding these matters.

69.     Because BLM issued a FONSI, it did not prepare an EIS.

70.     The FONSI states that the removal would "most likely commence in September, 2018," and Plaintiffs have been informed that in fact BLM intends to begin removing the young horses as early as September 2, 2018

71.     BLM has already prepared the traps for the removal, including placing food in them, which is causing the horses to fight over this unnatural food source and suffer injuries.

72.     Plaintiff Kathrens has already observed wild horses fighting over this bait.

73.     The DR states that "[w]ild horses with injuries . . . could be removed regardless of age," DR at 2, indicating that BLM intends to remove *more* than 17 horses, including perhaps some of the horses that are being injured as a result of fighting over food that BLM is already providing in the traps.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim I:  Violations of the Wild Horse Act and APA

74.     BLM's August 3, 2018 decision to remove 17 wild horses from the PMWHR violates the agency's duty to protect these wild horses under the WHA as "wild" and "free-roaming" horses in the PMWHR as "components of the public lands," 16 U.S.C. § 1333(a),

because it will impair the genetic viability of this extremely special herd. For the same reason,

BLM's decision violates its regulations which require it to manage wild horses as "self-

sustaining populations of healthy animals," 43 C.F.R. § 4700.0-6. Therefore, BLM's actions are

arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law within

the meaning of the APA, 5 U.S.C. § 706(2).

75.     BLM's August 3, 2018 decision, which will greatly impair the genetic viability of

the Pryor Herd, is inconsistent with and contravenes BLM's 2009 Herd Management Plan for the

PMWHR which emphasized the need to "maintain a viable breeding herd which could

perpetuate the characteristics of the Pryor Mountain wild horses." Accordingly, BLM's decision

is arbitrary and capricious and an abuse of discretion within the meaning of the APA, 5 U.S.C. §

706(2).

76.     BLM's August 3, 2018 decision is also arbitrary and capricious and an abuse of

discretion within the meaning of the APA, 5 U.S.C. § 706(2), because the agency failed to

address comments from wild horse experts, including Plaintiff Kathrens and the Pryor Mountain

Wild Mustang Center regarding the harm to the genetic viability that will result from BLM's

proposed gather, and because the agency failed to consider relevant factors concerning this issue

and to provide a rational basis for its decision.

77.     BLM's decision is also arbitrary and capricious and an abuse of discretion within

the meaning of  U.S.C. § 706(2) because BLM failed to raise the AML for the Pryor Herd, failed

to take into consideration that the 2016 AML Recalculation concluded that "[b]ased upon

monitoring data adjusted for precipitation, an AML of 121 adult wild horses is the maximum

number that can be maintained without damage to the range and to achieve a thriving ecological

balance," failed to take into account the 2016 addition of the Administrative Pastures, and otherwise failed to comply with the process required to re-evaluate an AML

78.    BLM's 2016 Recalculation of the AML also violates the WHA and BLM's own Handbook, and is arbitrary and capricious and an abuse of discretion within the meaning of the APA, 5 U.S.C. § 706(2), because (a) it failed to raise the AML to 121 based on its own conclusion that "an AML of 121 adult wild horses is the maximum number that can be maintained without damage to the range and to achieve a thriving ecological balance," and (b) it failed to take into account the addition of the Administrative Pasture.

79.    BLM's August 3, 2018 decision is also arbitrary and capricious and an abuse of discretion within the meaning of the APA, 5 U.S.C. § 706(2), because the agency has failed to implement the various range improvements that the 2009 HMAP stated were "needed to meet the objectives" of the Plan, including maintaining a genetically viable herd.

80.    BLM's decision to remove injured horses from the range regardless of their age, in addition to the 17 young horses slated for removal, also violates the WHA and implementing regulations and is arbitrary and capricious and an abuse of discretion within the meaning of the APA, 5 U.S.C. § 706(2), particularly when BLM is currently engaged in activities—i.e., leaving food out for the horses—that is causing these animals to fight each other.

81.    BLM's actions injure Plaintiffs in the manner described in ¶¶ 8-11.

**Claim II:  Violations of the National Environmental Policy Act and the APA**

82.    BLM's August 3, 2018 decision violates NEPA and the CEQ implementing regulations because although the Final EA purports to be tiered to BLM's 2009 HMAP for the PMWHR, it is inconsistent with and contravenes that Plan because the proposed action will greatly impair the genetic viability of the Pryor Herd, despite the 2009 Plan's stated objective "to

maintain a viable breeding herd which could perpetuate the characteristics of the Pryor Mountain wild horses." For the same reason, BLM's decision is also arbitrary and capricious and an abuse of discretion within the meaning of the APA, 5 U.S.C. § 706(2).

83.    BLM's decision violates NEPA and the CEQ regulations and is arbitrary and capricious and an abuse of discretion under the APA because it fails to consider the direct, indirect, and cumulative effects of the decision on the genetic viability of the herd, particularly with respect to impacts on genetic viability that have already occurred because of past removals, as well as the impacts that are likely to occur as a result of future removals of horses from the herd, and from sterilization that may result from the use of PZP.

84.    BLM's decision also violates NEPA and the CEQ regulations and is arbitrary and capricious and an abuse of discretion within the meaning of the APA, 5 U.S.C. § 706(2), because it failed to consider reasonable alternatives to the proposed action, including removing fewer horses, based specifically on their genetic heritage, while allowing the continued use of PZP and natural causes to reduce the size of the herd more gradually.

85.    BLM violated NEPA and the CEQ regulations when it purported to "recalculate" the AML, because it failed to (a) take into account and respond to public comment, (b) prepare appropriate NEPA documents, and (c) issue a final Decision Record.

86.    BLM's decision also violates NEPA and the CEQ regulations because the agency failed to prepare an EIS, even though BLM's actions implicate several of the CEQ significance factors, including that this action will forever destroy the genetic viability of this rare and much-loved herd of wild horses, which people from all over the world come to observe, study, and photograph, and because these impacts are "highly controversial;" "involve unique or unknown risks;" "may establish a precedent" for future removals of horses from the PMWHR, or

24

"represent[] a decision in principle about a future consideration"—i.e. that it is acceptable to decimate the genetic viability of the Pryor Herd in order to reach the current AML; and because the decision "threatens a violation of Federal . . . law"—i.e. the WHA and that statute's implementing regulations. 40 C.F.R. § 1508.27.

87.     BLM's actions injure Plaintiffs in the manner described in ¶¶ 8-11.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter an Order:

1.     Declaring that Defendants have violated the Wild Free-Roaming Horses and Burros Act and that statute's implementing regulations, the National Environmental Policy Act and the CEQ implementing regulations, and the Administrative Procedure Act;

2.     Temporarily and permanently enjoining BLM from carrying out its August 3, 2018 decision;

3.     Vacating the portions of the August 3, 2018 Decision Record and Final EA that authorize the removal of 17 young horses from the Pryor Herd, as well as injured horses regardless of age;

4.     Declaring that BLM's 2016 AML Recalculation is arbitrary and capricious and an abuse of discretion, and violates NEPA;

5.     Vacating the 2016 AML Recalculation;

6.     Requiring BLM to recalculate the AML by taking into account the additional habitat added to the PMWHR with the addition of the Administrative Pastures;

7.     Awarding Plaintiffs their attorneys' fees and costs in this action; and

8.     Granting Plaintiffs any further relief as the Court may deem just and proper.

Respectfully submitted,

___/s/ Katherine A. Meyer _____
Katherine A. Meyer
D.C. Bar No. 244301
kmeyer@meyerglitz.com

___/s/ Elizabeth L. Lewis_____
Elizabeth L. Lewis
D.C. Bar No. 229702
Llewis@meyerglitz.com

Meyer Glitzenstein & Eubanks, LLP
4115 Wisconsin Ave., N.W. Suite 210
Washington, D.C.  20016
(202) 588-5206 (O)
(202) 588-5049 (fax)

___/s/ Rebecca K. Smith _____
Rebecca K. Smith
Montana Bar No. 9658
Public Interest Defense Center, P.C.
PO Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Attorneys for Plaintiffs

Date:   August 29, 2018