FILED

AUG 3 1 2018

Clerk, U S District Court
District Of Montana
Billings

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| GINGER KATHRENS, and THE CLOUD FOUNDATION, | CV 18-125-BLG-SPW |
| Plaintiffs, | |
| vs. | ORDER |
| RYAN ZINKE, Secretary Department of the Interior, et al, | |
| Defendants. | |

On August 13, 2018, Plaintiffs Ginger Kathrens and The Cloud Foundation filed an action against Ryan Zinke and the Department of the Interior, as the parent agency to the United States Bureau of Land Management (BLM). (Doc. 1). Before the court is Plaintiffs' motion for a temporary restraining order and preliminary injunction (Doc. 5) to stop BLM's planned gather of seventeen Pryor Mountain Wild Horses, scheduled for September 2, 2018, at the Pryor Mountain Wild Horse Range.

## I.     Background

Established by the Secretary of the Interior in 1968, the Pryor Mountain Wild Horse Range was the first nationally designated area established to provide a home for free roaming horses. (Doc. 13-1, Bates No. 1587). The Range spreads

1

over 38,000 acres in Montana and Wyoming. (*Id.*). Although the exact origin of the wild horses that live on the Range is not entirely known, it is generally accepted that the horses are descendants of New World "Spanish" breeds originally brought to this country by the Spanish in the early 1500s. (Doc. 13-1, Bates No. 1592)

In 1971, three years after the Range was established, Congress passed the Wild Free Roaming Horses and Burros Act, ("WHA"), 16 U.S.C. §§ 1331-1340, and declared that wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West and that they enrich the lives of the American people. *See* 16 U.S.C. 1333(a). The WHA tasked BLM with caring for and managing wild horses on lands within its jurisdiction. *Id.*

As part of its obligation to manage the Range, BLM issued a herd management area plan ("HMAP") in 1984 establishing an appropriate management level ("AML") for the Range at 115-127 wild horses. (Doc. 13-1, Bates No. 1588). In 1992, BLM modified the 1984 HMAP and re-established the AML at 85 to 105 wild horses. (*Id.*). Finally, in 2009, BLM issued the Pryor Mountain Wild Horse Range ("PMWHR")/Territory EA and HMAP ("2009 HMAP") which authorized an increase in the AML to 90 to 120 horses. (*Id.* at Bates No. 1748). The purpose of the 2009 HMAP was to re-establish the AML, to develop prescriptions for habitat limitations, identify opportunities for improvement, and to emphasize

2

stabilization of ecological conditions. (*Id.* at Bates No. 1585). The 2009 HMAP

continues to apply to the Range today.

The 2009 HMAP was issued in conformance with the Resource

Management Plan for the Billings Resource Area, the objectives of which included

the following:

- "maintain a viable breeding herd which could perpetuate the characteristics of the Pryor Mountain wild horse;"

- "limit the reproduction rate and perpetuate the characteristics of the Pryor Mountain Wild Horse;"

- "begin[] a selection program to retain only those wild horses with confirmation, color and breeding characteristics typical of the Pryor Mountain Wild Horses;" and

- "maintain a healthy, viable herd that displays the characteristics typical of the Pryor Mountain Wild Horses."

(*Id.* at Bates No. 1595-96).

The 2009 HMAP also set forth herd characteristics objectives, and selective

removal considerations that guide BLM in conducting gathers. (*Id.* at Bates No.

1611-12). The herd characteristics objectives provide for BLM to manage the

population, (1) "for a phenotype reminiscent of a Colonial Spanish Type Horse,"

(2) for a balanced sex ratio, (3) for a core breeding population composed mainly of

five to ten year old horses, (4) to maintain rare or unusual colors to prevent any one

color from becoming dominant or being eliminated, and (5) to prevent the

elimination of bloodlines while maintaining the core breeding population. (*Id.* at

3

1611). Under the selective removal considerations, BLM must also consider several factors in determining which horses to remove, including the removal of horses younger than five years old that are "genetically well represented on the range." (*Id.*). In the 2009 Record of Decision accompanying the 2009 HMAP, BLM stated that, "[m]onitoring data will continue to be collected and the AML will be recalculated within five years or after the revision to the Billings RMP [Resource Management Plan], whichever comes first." (Doc. 13-1, Bates No. 1749).

Since 2009, BLM has conducted three gathers based on the 2009 HMAP AML: one in 2009, 2012 and 2015. (Doc. 13-1, Bates No. 73-74). BLM also annually treated between 36 and 75 mares with fertility control over this period of time. (*Id.* at Bates No. 73-81).

On August 23, 2013, Dr. Gus Cothran, an expert geneticist, issued a "Genetic Analysis of the Pryor Mountains Wild Horse Range." (Doc. 6-7). In his analysis, Dr. Cothran found that the genetic variability levels for the Pryor Herd has been in decline for all measures with a "general trend for decline in variations levels for the herd." (*Id.* at 4). Based on this information, Dr. Cothran opined that the "best way to maintain current levels would be to increase the population size if range conditions allow." (*Id.* at 4-5). In May 2016, BLM began adding additional

acreage to the Range which had been closed to wild horse use prior to that time. (Doc. 6-8); (*see also* Doc. 13-1 at Bates No. 0416).

In July 2016, this court found that the BLM had, by its language in the 2009 ROD, committed to recalculating the 2009 HMAP AML by 2015, but failed to do so. *See Friends of Animals v. Sparks*, 200 F. Supp. 3d at 1126. Accordingly, this court held that BLM acted arbitrarily and capriciously when it used the 2009 AML as the basis for removing 20 young horses from the Range in 2015. *Id.* In doing so, this court pointed out the differing requirements in BLM's Handbook for re-evaluating the AML and recalculating the AML, including the need for a HMA Evaluation Report, and a separate Decision Record when re-evaluating the AML. *Id.* at 1123.

Five months after this court's decision in *Sparks*, BLM issued the "Pryor Mountain Wild Horse Range Appropriate Management Level (AML) Recalculation Report." (Doc. 6-10). In the Report, BLM ran different formulas designed to measure a maximum carrying capacity for the Range, resulting in 98 horses under one formula, and 121 horses using the other. (*Id.*) According to the Report, "an AML of 121 adult wild horses is the maximum number that can be maintained without damage to the range and to achieve a thriving ecological balance." (*Id.* at 3). Based on its recalculations, BLM determined reestablishing the AML was not required because the "calculation was well within the previous

5

AML and accomplished what the HMAP intended." (*Id.* at 3; *see also* Doc. 14-4 at ¶ 17, *Bertola Decl.*). BLM obtained public comment after establishing the AML. (Doc. 6-16). There is no Record of Decision associated with the Report nor did BLM issue any HMA Evaluation Report. (*See* Doc. 6-10). BLM ultimately withdrew the Report from its national register for NEPA documents. (Doc. 16-3 at 2).

In the spring of 2018, the wild horse population on the Range remained above the 2009 AML at 154. (Doc. 13-1 at Bates No. , 84102). So, on January 14, 2018, BLM issued the 2018 PMWHR Bait/Water Trapping Gather and Fertility Control Preliminary Environmental Assessment (2018 PEA), which tiers to the 2009 HMAP, for public comment. (Doc. 13-1 at Bates No. 98-160).

In the 2018 PEA, BLM found that the horse population "is beyond the capacity of the range" and has resulted in continued degradation of the Range. (Doc. 13-1 at Bates No. 102-103). BLM identified a need to "protect rangeland resources and prevent unnecessary or undue degradation of public lands associated with excess wild horses within the [Range] and use of rangeland resources by wild horses." (Doc. 13-1 at Bates No. 106). BLM determined that to accomplish these goals, the wild horse population needed to be reduced and "a thriving natural ecological balance and multiple use relationship" needed to be restored. (*Id.*)

BLM identified and considered a proposed action, one action alternative, and a no-action alternative to achieve these objectives. (*Id.* at Bates No. 108-113). In relevant part, under the proposed action, BLM would selectively remove seventeen wild horses based on a tiered approach that included wild horses that are second and third foals or more of a given mare. (Doc. 13-1 at Bates No. 108). The proposed action would "primarily consist of removing excess wild horses 1-4 years old." (*Id.*) BLM would also remove wild horses foaled as a result of inbreeding, and wild horses with "injuries or health concerns" regardless of age. (*Id.*) Under Alternative A, BLM would conduct annual incremental gathers of up to 20 excess horses by selectively removing them in accordance with the 2009 HMAP, beginning in 2018. (*Id.* at Bates No. 112) And under the no-action alternative, BLM would do nothing. (*Id.*)

Various organizations and individuals provided comments and objections to the 2018 PEA during the comment period. (Doc. 13-1 at Bates No. 2072-2406). In its comments, The Cloud Foundation (TCF) noted its support for the removal of two inbred horses but pointed out that BLM's population figures and projections in the 2018 PEA were based on incorrect data. (*Id.* at Bates No. 2072-73). Specifically, TCF stated that: (1) the Pryor Herd did not contain as many horses as BLM calculated; (2) BLM's 8% recruitment percentage[1] is based on erroneous

---

[1] Recruitment percentage is how many progeny are added to the herd each year.

7

assumptions; (3) where BLM asserted that 10-12 foals were projected for 2017 and 2018, only 5 foals actually survived in 2017; and (4) horse deaths were outnumbering births so the birth rate is at less than half of the mortality rate. (*Id.*). Taking these errors into consideration, TCF suggested the AML for the decision could be and should be higher. (*Id.* at 2074). TCF also stated that because BLM's proposal did not take into account the matrilineal and patrilineal lines of each animal, wild horse bloodlines could accidentally be eliminated, an important consideration in light of the small herd size and the rare markers remaining in the Pryor Herd. (*Id.* at Bates No. 2074-76). Finally, TCF suggested that BLM should focus not on how many progeny a mare has foaled historically, but how many foals actually remain within the Pryor Herd in order to adequately preserve genetic lines and characteristics. (*Id.*).

The Pryor Mountain Wild Mustang Center also commented on the 2018 PEA, noting that BLM's historic management actions, combined with natural loss, were starting to result in a negative population effect given the Pryor Herd's declining growth rate observed in the last two years. (Doc. 13-1 at Bates No. 2106-2019). The Center warned that this trend will continue in the near future due to decreased foaling rates along with significant number of older individuals that are reaching the end of their lives. (*Id.*) As a result, the Center recommended that "gathers be used in combination with fertility to slowly help bring the herd toward

the AML" and that the removal criteria "be heavily modified in order to be

consistent with the 2009 HMAP's goal of maintaining genetic diversity through

management based on kinship." (*Id.* at Bates No. 2107). The Center also advised

that at least two offspring are necessary to preserve narrow genetic lines. (*Id.*)

On August 3, 2018, BLM issued its 2018 Final EA, Decision Record, and

Finding of No Significant Impact ("FONSI"). (Doc. 6-14). According to the

Decision Record, BLM decided to adopt the proposed action and remove the

seventeen selected wild horses aged 1-4 from the Pryor Herd and to implement the

proposed modifications to the on-going fertility program. (*Id.* at 4). The Final EA

adopted TCF's adjusted population number of 154, but rejected TCF's and the

Center's alternatives, stating that the alternatives "would continue to grow the

population and not meet the purpose and need of the EA." (Doc. 13-1 at Bates No.

18).

In a notable departure from the 2018 PEA, BLM decided that "each active

breeding mare would have at least one progeny to carry forward into the next

generation," (*id.* at Bates No. 12), as opposed to the tiered method in the 2018

PEA, which included two and three foals per mare. (Doc. 13-1 at Bates No. 108).

BLM stated that this particular proposed action "would specifically include

managing to maintain rare or unusual colors . . . and managing to prevent

bloodlines from being eliminated." (*Id.* at Bates No. 12). The FONSI "determined

9

that the environmental impacts associated with the Proposed Action are not significant individually or cumulatively and will not significantly affect the human environment." (Doc. 13-1, Bates No. 85). The Decision Record provided for removal operations to begin in September, 2018. (*Id.* at Bates No. 84).

BLM provided the following table in the 2018 Final EA identifying the wild horses slotted for removal and those not considered:

| TABLE 1. LIST OF WILD HORSES TO BE REMOVED AND THOSE NOT CONSIDERED FOR REMOVAL. | |
| --- | --- |
| **To be Removed** | **Not Considered for Removal** |
| 201402 Orlando (m) 6th foal of Greta. Tier 1 in 2015. | 201401 Oracle (m) 2nd foal of Hataalii, first foal removed. |
| 201407 Oak (m) From full sibling mating. | 201405 Oglala (m) Prevent bloodlines from being eliminated. |
| 201410 Outlaw Lady (f) 3rd foal of Helenium. | 201412 Oro (m) 1st foal of Maia. |
| 201502 Prospera (f) 5th foal of Fiasco. | 201416 Oklahoma (m) 1st foal of Lariat. |
| 201411 Okomi (m) 6th foal of Firestorm. | 201418 Oceana (f) 1st foal of Galadriel. |
| 201504 Pele (f) 2nd foal of Fool's Gold. | 201419 Orielle (f) 2nd foal of Inocentes, first foal removed. |
| 201505 Parry (m) From full sibling mating. | 201420 Okiotak (m) 1st foal of Ketchikan. |
| 201507 Petra (f) 5th foal of Galena. | 201501 Phantom (f) Prevent bloodlines from being eliminated. |
| 201511 Pegasus (f) 11th foal of Ireland. | 201506 Cloud's Pride (m) Rare color |
| 201601 Quasar (m) 2nd foal of Kitalpha. | 201508 Banjo Paterson (m) Phenotype |
| 201602 Quanah (m) 4th foal of Halcyon | 201509 Petite Colour (f) 1st foal of Kohl. |
| 2001603 Quintasket (f) 4th foal of Helenium. | 201510 Prima (f) 1st foal of Nova. |
| 201604 Quaid (m) 7th foal of Greta. | 201512 Patriot (m) 2nd foal of Jacinta, first foal removed. |
| 201607 Quillan (f) 12th foal of Ireland. | 201513 Pax (m) 1st foal of La Nina. |
| 201608 Quahneah (f) 13th foal of Washakie | 201514 Penn (f) Prevent bloodlines from being eliminated. |
| 201705 Rio (m) 3rd foal of Jacinta | 201515 Pilar (f) 1st foal of La Brava. |
| 201706 Morning Reverie (f) 4th foal of Hataalii. | 201606 Quintana (f) Prevent bloodlines from being eliminated. |
| | 201701 Rigel Starr (f) Prevent bloodlines from being eliminated. |
| | 201708 Ryden (m) 1st foal of Jasmine. |
| | 201709 Ruby (f) 1st foal of Juniper. |

(Doc. 13-1, Bates No. 14).

10

## II.    Legal Standards

### A.    Temporary Restraining Order

Temporary restraining orders ("TRO") are governed by the same standard applicable to preliminary injunctions. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 n. 7 (9th Cir. 2001). A TRO may issue if a plaintiff shows: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to them in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def Council*, 555 U.S. 7, 20-23 (2008).

"Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. The Ninth Circuit has held that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir.2011).

The "serious questions" standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction. *Id.* at 1132. Serious questions "need not promise a certainty of success, nor even

11

present a probability of success, but must involve a 'fair chance of success on the merits.'" *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 2003).

## III. Discussion

For Plaintiffs to succeed on their motion, they must make a showing on all of the elements of the *Winters* test. *Cottrell*, 632 F.3d at 1135. This court addresses each prong of the analysis in turn.

### A. Serious Questions Going to the Merits

Plaintiffs allege that BLM's decision violates the WHA in three ways. First, Plaintiffs allege that BLM's decision fails to protect the horses as "wild" and "free-roaming" components of the public lands and manage them as "self-sustaining populations of healthy animals." Next, Plaintiffs argue that the decision contravenes BLM's prior commitment in the 2009 Herd Management Plan to manage these particular horses to maintain their genetic viability. Finally, Plaintiffs contend that BLM's reliance on an outdated and incorrect AML violated the WHA and this court's order in *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114 (D. Mont. 2016).

Plaintiffs argue that BLM violated NEPA by failing to respond to its own experts' concerns about the gather, failing to consider all viable and reasonable alternatives to the proposed action, contravening the 2009 HMAP, and failing to

take a "hard look" by failing to consider the wild horses' genetic diversity in its analysis.

Because neither the WHA nor NEPA contains an internal standard of review, Plaintiffs' claims are governed by § 706 of the Administrative Procedure Act ("APA"). Under the APA, the court must set aside those agency actions which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D).

An agency's decision is arbitrary and capricious if it fails to consider important aspects of the issue before it, if it supports the decision with explanations contrary to the evidence, or if its decision is either inherently implausible or contrary to governing law. *In Defense of Animals v. U.S. Dept. of Interior*, 751 F.3d 1054, 1061 (9th Cir. 2014). A decision that is "inconsistent with a statutory mandate or that frustrate[s] the congressional policy underlying a statute" cannot be upheld. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005). Although this review is "searching and careful," the arbitrary and capricious standard is narrow, and the court cannot substitute its own judgment for that of the agency. *In Def. of Animals*, 751 F.3d at 1061.

## 1. Wild Horse Act Violations

### A. The Act

Because of Congress' concern that wild horses were vanishing from the West, it passed the WHA to protect wild horses from "capture, branding, harassment, or death" and ordered that the horses were to be considered "an integral part of the natural system of the public lands." 16 U.S.C. § 1331. To that end, the Act directs the Secretary of the Interior to "protect and manage wild free-roaming horses and burros as components of the public lands . . . ." 16 U.S.C. § 1333(a).

Not long after the WHA was created, however, wild horses began to overpopulate and threaten the health of the land. *See Cloud Found. v. U.S. Bureau of Land Mgmt.*, 802 F. Supp. 2d 1192, 1198 (D. Nev. 2011) (internal citations omitted). Congress thus amended the WHA in 1978 to "continue the policy of protecting wild free-roaming horses and burros from capture, branding, harassment, or death, while at the same time facilitating the removal and disposal of excess wild free-roaming horses and burros which pose a threat to themselves and their habitat and to other rangeland values." *Id.* at § 2(a)(1-6). The amendments gave BLM, as the Secretary of the Interior's designee, greater authority to manage wild horses.

Under the new amendments, BLM must manage wild horses and burros "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). BLM's management duties include maintaining an inventory of wild horses and burros on given areas of public lands to determine where overpopulation exists, determining whether action should be taken to remove excess animals, establishing the AMLs for different areas, and implementing the method(s) for maintaining AMLs (e.g., removal, sterilization, adoption). *See In Def. of Animals*, 751 F.3d at 1062.

Each area "established for the maintenance of wild horse and burro herds" is called a "Herd Management Area" ("HMA"). 43 C.F.R. § 4710.3-1. BLM is tasked with establishing the AML for each HMA, which is "expressed as a population range within which [wild horses] can be managed for the long term in a given management area without resulting in rangeland damage." (Doc. 13-1, Bates No. 1868); *see also* 16 U.S.C. § 1333(b)(1) (authorizing BLM to establish AMLs). BLM establishes both a low and high AML. (*Id.*) The upper limit is the "maximum number of [wild horses] which results in a [thriving natural ecological balance] and avoids deterioration of the range." (*Id*).

To address Congress' concern about overpopulation, amendments to the WHA further provide that if the inventory reveals an overpopulation of horses and BLM determines that "action is necessary to remove excess animals," BLM "shall

immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2)). "Thus, while the overarching purpose of the Act is to protect wild horses and burros from "capture, branding, harassment or death," 16 U.S.C § 1331, BLM is required to remove wild horses and burros from a given area of the public lands when an overpopulation exists. *Id.*

## B. Violations

### a. Maintaining the Genetic Viability of the Pryor Herd

Under the WHA, the BLM has a duty to protect the Wild Horses as "wild" and "free-roaming" components of the public lands, 16 U.S.C. § 1333(a), and the agency's implementing regulations, 43 C.F.R. § 4700.0-6, require BLM to manage all wild horses "as self-sustaining populations of healthy animals." Plaintiffs assert that BLM's planned removal of so many horses, and certain horses in particular, will not leave a "self-sustaining population[ ] of healthy [wild horses]" on the Range. *See* 43 C.F.R. § 4700.0-6. In support of this argument, Plaintiffs cite to BLM's National Wild Horse and Burro Advisory Board member Ginger Kathrens' affidavit, which discusses the many effects that this particular removal will have on the Pryor Herd's genetic variability. (Doc. 6-1 at 5-6).

First, Kathrens states that the decision took only matrilineal genetic lines into consideration, with no regard for preserving patrilineal genetic lines. (*Id.* at ¶

16

11). According to Kathrens, focusing only on the matrilineal lines may result in accidental elimination of important bloodlines. (*Id.*) For example, one of the horses slated for removal, Quahneah, is the last breeding mare of the Baya/Washakie line. (*Id.* at ¶ 18(c); *see also supra* Table 1). In other words, with Quahneah's removal, the Baya/Washakie line will forever be eliminated from the Pryor Herd. (*Id.*). BLM responded to this concern in the 2018 EA by stating that the proposed action "manages to prevent bloodlines from being eliminated while maintaining a core breeding population" where "[e]ach active breeding mare would have at least one progeny to carry forward into the next generation." (Doc. 13-1, Bates No. 47). This is unresponsive to Kathrens' description of consequences from losing patrilineal lines, however, and seems to be refuted by the fact that Quahneah is included for removal not withstanding that she has no progeny to carry her bloodlines forward. BLM does not otherwise discuss the loss of patrilineal lines on the Pryor Herd in the decision.

Kathrens also points out that leaving one offspring per mare will not ensure that bloodlines will continue in light of foal mortality rates, and in fact "will lead to the elimination of entire genetic lines." (Doc. 6-1 at ¶ 18(c)). Specifically, Kathrens states that a single offspring cannot shoulder the burden of carrying an entire genetic line in light of the high foal mortality rates of the Pryor Herd. (*Id.*) Despite the fact that the Pryor Mountain Mustang Center also advised that at least

two offspring are necessary to preserve narrow genetic lines, and Dr. Cothran's determination that the genetic variability is in decline, BLM's decision establishes a one progeny rule without further discussion. This suggests to the court that BLM may have arbitrarily and capriciously failed to consider the ramifications of the loss of the horses it has chosen to remove.

Plaintiffs argue that BLM's decision removes horses with unique coloring, which threatens to eliminate unusual colors in violation of the 2009 HMAP's direction to "manage to maintain rare or unusual colors." (Doc. 13-1, Bates No. 1611). Kathrens points out that Quintasket, a horse slated for removal, is one of only six sorrels in the entire Pryor Herd, so her removal threatens the elimination of the sorrel phenotype. (Doc. 6-1 at ¶ 18(e).

In response to this concern, BLM points to the proposed action language that BLM will "manage to maintain rare or unusual colors (for the Pryors) in order to prevent any one color from becoming dominant or being eliminated." (Doc. 13-1, Bates No. 48). But merely reciting the proposed action language does not explain *how* BLM is managing to maintain rare colors in light of Plaintiffs' specific challenge. And the removal of Quintasket seems to indicate that rare colors are not being managed and raises questions again about whether BLM actually and adequately considered this issue.

BLM's failure, to adequately consider these issues - despite the views of experts it has used and who are on its Advisory Board - has, at a minimum, raised "serious questions" on the merits of Plaintiffs' claim regarding BLM' violation of the WHA and whether BLS acted arbitrarily and capriciously under the APA by failing to consider important aspects of the issues before it and supporting its decision with explanations contrary to the evidence.

### b.     2009 HMAP Commitment

Plaintiffs argue that BLM's decision violates its commitment in the 2009 HMAP, to which the 2018 EA is tiered, to "prevent bloodlines from being eliminated while maintaining a core breeding operation." (Doc. 13-1, Bates No. 1611).  Kathrens stated in her Affidavit that based on the table of horses to be removed, at least one entire bloodline will be eliminated immediately with the removal of Quahneah (listed 3rd from the bottom of Table 1, *supra*), and the possible extinction of two additional matrilineal lines with the removal of Morning Reverie and Prospera, (4th from the bottom and the final listing on Table 1, *supra*). (Doc. 6-1 at ¶¶ 18(c)-(d)).

BLM did not respond to this issue in its decision, nor did it respond to the argument in briefing before this court.  In its response, BLM stated that "the 2018 gather will not have the effects claimed by Plaintiffs." (Doc. 14 at 22).  Because BLM is bound to the commitment it made in the 2009 HMAP, *see* 40 C.F.R. §

15015.3, the court finds that Plaintiffs have raised serious questions on the merits as to whether BLM's decision failed to consider this issue and whether the decision violates the WHA by failing to adhere to the 2009 HMAP's mandate on preventing the loss of bloodlines.

### c.   Properly Calculating the AML

Plaintiffs argue that BLM's decision is unlawful because BLM failed to re-calculate the AML for the Pryor Herd, in accordance with this court's order in *Friends of Animals v. Sparks,* 200 F. Supp. 3d at 1122-26. In that case, BLM acknowledged that recalculating the AML was a more in-depth process than reaffirming the AML, and that recalculating the AML was equivalent, process-wise, to establishing the AML. *Id.* at 1123. As a result, this court noted the heightened requirements for recalculating the AML according to BLM's Handbook, including "a separate decision process" from the gather planning process, "accomplished by issuing a separate Decision Record" and "document[ing] the results of this analysis in an HMA Evaluation Report . . . provided to the public for a 30 day review and comment period." *Id.*

Despite this court's ruling that BLM needed to recalculate the AML prior to another gather, Plaintiffs note that in BLM's decision at issue, BLM stated that its 2016 "Recalculation Report" "reaffirmed the AML established through the 2009 HMAP." (Doc. 13-1, Bates No. 55). Plaintiffs point out that BLM does not

dispute that it failed to conduct any NEPA review, the Recalculation was done

prior to seeking public comment, and there is no Decision Record contained in the

Administrative Record, despite this court's order. (Doc. 6-16; *see also* Doc. 13-1).

BLM generically responds that "there is no requirement for BLM to conduct

a new AML determination prior to each gather decision; it is enough to assess

whether the existing AML is appropriate." (Doc. 14 at 21). While BLM correctly

recites the rule from *In Defense of Animals*, 751 F.3d at 1061, which typically

applies during general gathers, it ignores BLM was under federal court order to

recalculate the AML prior to another gather. *See Sparks*, 200 F. Supp. 3d at 1125-

26. Accordingly, BLM's response is unavailing.

BLM also argues that it prepared the 2016 Recalculation Report fully

analyzing new data "to determine whether the 2009 AML needed to be adjusted or

re-established." (Doc. 14 at 21). But this response ignores the fact that this court

already made that determination in *Sparks,* when it held that BLM had committed

to recalculating the AML before 2015, and its failure to do so was a violation of

the NEPA process. 200 F.Supp.3d at 1125. Accordingly, this court finds that

Plaintiffs have raised serious questions on the merits whether BLM complied with

*Sparks* and satisfactorily recalculated the AML. Because it appears that the answer

may be no, Plaintiffs have also raised serious questions on the merits about

whether BLM's reliance on an outdated AML to support its decision was arbitrary

and capricious, and whether its duty to act under the WHA has even been triggered.

### d. Conclusion

At this early stage, this court cannot conclude that Plaintiffs have established a likelihood of success on the merits. Nevertheless, for the reasons discussed above, this court determines that Plaintiffs have raised serious questions going to the merits of their WHA claims. As a result, this prong is established and the court need not address Plaintiffs NEPA claims at this time.

## B. Irreparable harm

A plaintiff must show that an irreparable injury is likely, not merely possible, before a temporary restraining order may be issued. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (reversed on other grounds *Am. Trucking Ass'ns v. City of Los Angeles*, 596 F.3d 602 (9th Cir. 2010)) (emphasis added). "Issuing a [TRO] based only on a possibility of irreparable harm is . . . an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 20.

BLM argues that Plaintiffs cannot establish irreparable harm because the situation is materially indistinguishable from the one in *Sparks*, where this court held that there was no irreparable harm because the horse population would "quickly replenish" despite the gather. (Doc. at 14). This court disagrees. Unlike

22

in *Sparks*, Plaintiffs have demonstrated here that the gather will result in tangible, irreversible harms: the extinction of at least one bloodline and possibly more, and reduction of the sorrel phenotype currently represented in the Pryor Herd.

In *Alliance for the Wild Rockies*, the court found irreparable harm where the defendants' conduct would physically alter over 1,500 acres of the forest landscape. 632 F.3d at 1135. The court reasoned that forests, by their nature, do not recover or change quickly; thus the injury was naturally considered of "long duration." *Id.* (finding environmental injuries often permanent or at least of long duration, i.e., irreparable.). BLM argues that one removal action will not result in the permanent loss of genetic diversity of the Pryor Herd. (Doc. 14 at 15). This conclusion is contrary to the evidence before the court. Extinction of a bloodline or phenotype is, by its nature, loss of genetic diversity. And extinction, meaning forever, is certainly a long duration. This court finds that Plaintiffs have established a likelihood of irreparable harm absent a TRO.

## C.     Balance of hardships/Public Interest

Since the parties' arguments concerning the balancing of hardships and public interest factors are sometimes conflated, the court discusses these factors together, nevertheless acknowledging that they are separate elements. *See League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (The public interest inquiry is distinct from the

23

balancing of equities, and "primarily addresses impact on non-parties rather than parties.").

When ruling on a TRO, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Arc of California v. Douglas,* 757 F.3d 975, 991 (9th Cir. 2014) (citation omitted). Said differently, the restraining order must "do more good than harm (which is to say that the balance of equities favors the plaintiff)." *Cottrell*, 632 F.3d at 1132.

BLM asserts that to implement the gather, it has expended or will expend approximately $66,500, which includes set up, removal of traps, corral preparation, travel costs, rental vehicles and fuel, hay, bait, and continuous fencing and replacement gates and panels. (*Id.* at ¶ 18). The public obviously has an interest in government expenses. It seems to the court, however, that BLM will incur the majority of these expenses regardless of when the gather is scheduled, so the financial detriment from the gather will not be significantly impacted by the TRO. For example, continuous fencing and replacement gates and panels will be used whether or not the gather occurs on September 1, 2018 or sometime in 2019. Corral preparation will need to occur regardless of when the gather occurs, as will set up and removal of the traps.

24

BLM also asserts that delaying the gather will make the round-up much more difficult and expensive because: (1) some personnel are taking vacation; (2) personnel from other states may have to assist later in September; (3) government travel becomes more "problematic" at the end of the fiscal year; and (4) as time goes by there is a greater chance of changing or inclement weather. (Doc. 14-4 at ¶ 12, *Bertola Decl*). These theoretical economic losses, however, appear to be largely speculative and BLM could likely ameliorate them by factoring them into scheduling decisions.

Mostly, BLM's complaints involve inconvenience. While the court sympathizes with such inconveniences, it presumes BLM personnel will inevitably return from vacation and although government travel may become more "problematic" at the end of the fiscal year, it still occurs. And, insofar as delay may force BLM to have to deal with harsher weather conditions, it also may not.

While economic losses are given some weight in the process of balancing the equities, they may be outweighed by environmental interests, particularly when the losses may be regained if the project goes forward. *Connaughton*, 752 F.3d at 765-66. The economic losses, if any, to BLM appear to be minimal.

BLM argues that if the excess horses are not removed, the horse population will increase by 8%, the population will rise to 166 horses, and the range will suffer. Plaintiffs point out, however, that the mortality rate in 2017 was twice that

of the birthrate, which tends to undermine BLM's concerns about a significant

population increase. Additionally, Plaintiffs argue that they have identified six

horses that may be removed this year without causing harm to the genetic viability

of the wild horses. BLM also failed to respond to Plaintiffs contention that at least

some of the damage to the range is attributable, at least in part, to its failure to

implement range-land improvements. The public has an interest in determining

whether the BLM is complying with its commitments to the Range, in light of

government spending. The public also has an interest in the health of the Pryor

Herd, considering the amount of interest and tourism to the area the wild horses

bring.

Plaintiffs argue that the balance of equities tips sharply in their favor

because they will certainly suffer irreparable harm if the injunction is not granted.

Specifically, Plaintiffs contend that they, as well as the public, will suffer the

"demise of the Pryor Herd." (Doc. 6 at 26). Typically broad, generic injuries such

as these fail to establish the existence of an irreparable injury. But here, the court

is persuaded because Plaintiffs have specifically pointed out that BLM's gather

will result in the extinction of at least one Pryor Wild Horse bloodline, and

potentially more.

These bloodlines have existed for over 500 years. Consequently, failing to

maintain the status quo to determine whether BLM has appropriately complied

with the WHA and NEPA before extinguishing certain bloodlines forever does more harm than good. The tangible loss of bloodlines is also what distinguishes this case from the harms alleged in *Sparks,* 200 F.Supp.3d 1114 (D. Mont. 2016); *Cloud Found. v. Salazar,* CA 09-1651 (D. D.C. 2009); *Cloud Foundation, Inc. v. Kempthorne,* 2008 WL 2794741 (D. Mont. 2008); *Defs. of Wildlife v. Salazar,* 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009); *Greater Yellowstone Coal. v. Babbit,* 952 F. Supp. 1435, 1445 (D. Mont. 1996), *aff'd,* 108 F.3d 1385 (9th Cir. 1997); *Intertribal Bison Co-op. v. Babbitt,* 25 F. Supp. 2d 1135, 1140 (D. Mont. 1998) *aff'd sub nom*; *Greater Yellowstone Coal. v. Babbitt,* 175 F.3d 1149 (9th Cir. 1999) (Mem.); and *Humane Soc'y v. Babbitt,* 46 F.3d 93, 98 (D.C. Cir. 1995).

In short, the court finds that a TRO is in the public's interest and the balance of equities tips sharply toward the Plaintiffs because the harms Plaintiffs face are permanent, while BLM faces temporary delay. *See Save our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1125 (9th Cir. 2005) ("when an environmental injury is sufficiently likely, the balance of harms [versus financial injury] will usually favor the issuance of an injunction to protect the environment").

### D.    Conclusion

For the reasons set forth above, this court finds and concludes that Plaintiffs have shown serious questions going to the merits of the case and that they will suffer irreparable injury sufficient to justify the issuance of a temporary restraining

order.  Further, the balance of hardships and the public interest favor Plaintiffs.

Therefore, Plaintiffs have established that they are entitled to a TRO.

## IV.    Order

Plaintiffs' application for TRO is GRANTED.  Defendants are hereby

ENJOINED from conducting the wild horse gather set for September 2, 2018,

pending a hearing on Plaintiffs' motion for preliminary injunction.

IT IS FURTHER ORDERED that Plaintiffs may submit supplemental

briefing with respect to their motion for a preliminary injunction on or before

September 10, 2018; and Defendants may submit supplemental briefing with

respect to Plaintiffs' motion for a preliminary injunction on or before September

17, 2018.  Plaintiffs have until September 24, 2018, to file a reply.

IT IS FURTHER ORDERED that a hearing on Plaintiffs' motion for

preliminary injunction is set for September 28, 2018, at 9:30 a.m., at the James F.

Battin Courthouse, 2601 Second Avenue North, Billings, Montana.


DATED this _31st_ day of August, 2018.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge